## THE QUAKER CITY.

### CHAMBERS v. UNITED STATES.

No. 77 of 1930.

District Court, E. D. Pennsylvania.

Oct. 26, 1931.

Mortimer W. H. Cox, of Philadelphia, Pa., for libelant.

Charles M. Bolich, Asst. U. S. Atty., of Allentown, Pa., and Biddle, Paul, Dawson & Yocum, of Philadelphia, Pa., for the United States.

DICKINSON, District Judge.

A ruling in this cause has awaited briefs which we now have. We wish to make ac-

knowledgment of the aid these briefs have been to us. They present a fair and adequately full discussion of all the issues of fact and law which arise and have very much shortened our labors. For this we wish to express our appreciation.

The claim is twofold. One is in tort for the consequential damages flowing from the charged negligence of the respondent and is rested upon an asked finding of negligence; the other is for cure and maintenance, the basis of which is an obligation of the ship imposed upon it through the enforcement of a policy of the law maritime. These claims are in the alternative, as damages under the first claim would be inclusive of an allowance under the other.

The first question is that of negligence. There are two fact theories or versions of the story of the happening which resulted in the hurts sustained by the libelant and his consequent money loss. That of the libelant is that he had been on shore leave with another member of the crew; his shipmate was drunk and the libelant brought him back to the quarters of the crew where they had nearby bunks one over the other; that the shipmate became sick and vomited; a quarrel arose between them over this which provoked, however, only abusive language; that the shipmate insisted upon going on deck in disregard of the remonstrances of the libelant; that the latter finally permitted his shipmate to go on deck; that he afterwards suffered a twinge of conscience, fearing that his drunken comrade might come to harm, for which the libelant would feel himself to blame; that under the impulse of this feeling he went on deck to protect his shipmate and endeavored to take him back to his berth; that the drunken man resisted this attempt, and in the struggle which ensued both men were precipitated through a hatchway, which had negligently been left open and unguarded.

The other version of the story is that the two men went out together and indulged themselves in a drunken spree, which was accompanied with a drunken quarrel; that following the vomit episode a challenge passed from one to the other to go on deck to fight it out; that they did so; and that in the drunken struggle between them they pulled each other through the guards by which the opening in the hatchway was protected, and they fell to the resulting death of one and the now claimed injuries of the other.

The negligence charged is the act of the respondents in leaving the opening in the hatchway without an adequate guard or protection. Negligence cannot be admeasured without a prior inquiry into the measure of duty. The hatchway was so located as to be near the path of those who had occasion to pass to and fro on the vessel. A duty consequently was imposed upon the ship to make this pathway reasonably safe for the purpose for which it was expected to be used, and if the hatchway was open to provide reasonably safe guards and protection in accordance with the usages, customs, and ordinary requirements of the ship's business so that the passageway near it would be rendered reasonably safe. There was no obligation to make of the deck near the hatchway a "squared circle" safe against the mishaps which might befall battling pugilists.

There is no need to prolong the discussion of this feature of the case. Our finding is against the negligence charged. The opening in the hatchway was not due to negligence, but had been made for the purpose of "sweetening" the air below the deck. It was safeguarded in the usual and customary way. A coaming of nearly or quite two feet surrounded it, and this was supplemented by a life line or rope railing which adequately protected every one in any expected or anticipated use of the deck near the opening. The guard was not adequate to prevent one being pushed into the opening by an assailant, nor was the ship bound to·this measure of protection.

The tort basis of the libel is not sustained.

The real question is·the obligation of the ship to the claim for cure and maintenance. Here the obligation is aside from all thought of tort, negligence, or fault. The principle is really one of necessity backed by humanity. Members of the crew have no haven other than the ship. If sickness or hurt befalls them, what can be done? They cannot be left to die or be fed to the sharks. The ship must per force take care of them. There is likewise the humanity appeal which runs into the same necessity. It would be inhuman to leave a helpless man without succor. Some one should give him aid. Who other than the ship? It is true that there is a limitation of the responsibility of the ship which is voiced in the phrase "that the illness must not be the result of the gross misconduct of the seaman when not on the ship's business." The quotations with which we have been favored from the Laws of Oleron, of Wisbury, of the Hanse Towns, and the ordinances of Louis XIV make this limita-

tion clear. An incident in Dana's "Two Years before the Mast," in which Dana ministered to an afflicted sailor to whom the captain had refused help from the ship's stores, also throws light upon it.

The sailor must, of course, be in the service of the ship or there is no obligation, but it does not follow that he loses the right to cure and maintenance unless he is actually at work when sickness or hurt comes upon him. We do not subscribe to the doctrine that if a sailor is sent aloft and falls to his hurt he had this right, but if when off active duty he goes aloft of his own accord to get a better view of something which has aroused his curiosity, or even if he is skylarking in the rigging and meets with a like mishap, he forfeits all claim for curative aid. It is to be always kept in mind that the obligation is not founded upon any fault of the ship.

■ It is to be further noted that the right to cure is not because the injury or sickness was due to the mere fault of the seaman. There must be in what he did a punitive element with a resultant forfeiture. The phrase in use is in consequence that "gross misconduct" will forfeit the right to cure at the expense of the ship. Translated into the fact features of this case, the doctrine of the law is that if the libelant and his shipmate were fighting in a prearranged battle, each striving to push the other through the hatchway, the ship was under no obligation to care for the wounded. If, however, the hurt of the libelant was due to the mishap of being pushed into the hatch opening by the drunken resistance of the man he was attempting to get away from the danger of falling into an opening or falling overboard, then the ship must take care of him.

■ The first question is the relation of the libelant to the ship. He had been a member of the crew on a voyage which ended at the port. He re-engaged for a new or continued voyage to Norfolk. He was thus in the service of the ship. He was not when injured doing any actual work about the ship's business. We hold his right to cure depends upon his being at the time in the general service of the ship, not upon whether he was in actual fact upon the ship's business at the time when hurt. If, however, there was both gross misconduct which brought his hurt upon him and at the time he was not on the ship's business, the ship is relieved from the obligation of cure. It will thus be seen that the right here turns upon what the libelant was doing or attempting to do. Was he, as he now says, on a rescue mission or was he fighting? We have already found that no very great reliance can be placed upon the fact version given us by this libelant. This is not merely because of flatly inconsistent statements made by him, but because he has said he has no very clear recollection of the happenings of that night. This dimness of memory might be due to the fact that he was drunk (as any one might well believe), or, as he ascribes it, to the after effect of his injuries. To whatever due, it very much lessens the value of his testimony.

The two versions of the occurrence differ essentially in this—one is that the libelant and his shipmate were on a drunken spree together, ending in a fight; the other that the libelant was taking care of a drunken mate.

The quoted phrase of Judge Neterer "that the term 'drunken sailor' has become obsolete in the American Marine" must be taken as the expression of a hope not the statement of a fact. That conditions have very much improved and along with them the type of men who make up ships crews is happily true. The practices of the Press Gang and of Shanghaiing are known to us only through the pages of history. Crews are now made up of volunteers. The credit for improved conditions must not be denied to sailors having been given the protection of the law and the awarding of that protection being due in large part to the better organization of seamen than in the old days. We are glad to make a formal finding that conditions have improved and the type of sailor has correspondingly risen. As long, however, as human nature is what it is, men who have been cooped up in the narrow quarters of a ship subjected to sharp discipline from their officers and to the sharper discipline of regular and continuous employment with its consequent monotony will, in the exuberance of their first liberty on shore, "take their fling" by indulging in practices which every one must deplore.

■ We can easily believe and find as a fact that the two men concerned in this mishap were drunk. The controlling fact question is not whether the libelant was drunk, but the answer to the other question of why he went on deck? Was it to meet a challenge to fight, or was it to save his drunken shipmate from harm? There is plenty of room for the belief and ample evidence to support the finding that he met his injuries and his shipmate met his death as the result of making or accepting a challenge to fight. Indeed, there is the testimony of

eyewitnesses of the occurrence to this fact. This testimony, however, goes only to the fact of a struggle which had all the appearances of a battle and the inference drawn therefrom. The testimony of the libelant is that what he was trying to do was to take a drunken and angry sailor to his bunk. Any one who has observed the efforts of one drunken man to induce another to go with him can readily understand that his really friendly efforts might be mistaken by an observer for a fight. Indulgence in an abundance of "sailor talk" has not much significance. We have refused to accept the testimony of the libelant in its bearing upon other features of his claim and are aware of the seeming inconsistency of accepting his statement of his motive in going on deck. We do so, however, because we had this libelant under observation. He had neither the physique nor the temperament which would have led him to either issue or accept a challenge to fight. Egotism leads men of his rank to fight. If a man has a swollen idea of his physical prowess, he is prone to feed his egotism by giving a helpless drunk a licking. Another type is one who, although he would willingly avoid a fight, is ashamed not to fight when under the eyes of others. The libelant does not belong to the first class and he did not have the second motive for fighting. We venture the confident belief that in his contacts with his messmates he avoided fisticuffs. This is not meant to be a reflection upon his courage but a tribute to his good sense. He has not the build of a fighter. We can easily understand that a man of his type would under his first impulse refuse to go on deck and yet later might go on the errand on which he says he went. At all events, we make this finding in his favor. In making this, we do not wish to be misunderstood. We have found that the libelant was drunk, and we do not wish to be understood as finding that drunkenness is not misconduct. When the right to cure for hurt and disease became part of the law maritime, "drunken sailors" were not unknown, whatever the fact may be to-day, and our finding is that mere drunkenness does not forfeit the right.

Without extending an already overlong opinion, we make the following fact findings and state the conclusions of law arising thereout:

### Findings of Fact.

1. The respondent was guilty of no negligence in permitting the hatchway opening.

2. The respondent was not guilty of any negligent failure to properly protect and guard the hatch opening.

3. The respondent was guilty of no negligence which was the proximate, real, efficient cause or causa causans of, the libelant's fall into the hatchway opening.

4. The libelant at the time he received his hurt was in the service of the ship.

5. The libelant was not at the time doing any work for the ship or about the ship's business.

6. The libelant sustained hurts which called for "cure and maintenance."

### Conclusions of Law.

1. The libelant has no legal claim for consequential damages flowing from his hurts.

2. The libelant has a legal claim for "cure and maintenance" at the expense of the ship.

We make at this time no award to the libelant, as the parties will doubtless be able to agree upon the sum which should be awarded. On their failure so to do, the sum will be found by the court through a commissioner or otherwise.

An appropriate order may be submitted, the court retaining jurisdiction of the cause for this purpose.